# EXHIBIT A

99 DEC -9 AM 10:31

**IN THE UNITED STATES DISTRICT COURT**
**IN AND FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| ELLEN GAYLE MOORE, FANNIE McCONNELL, SPENCER WILLIAMS and ANITA BOWERS, on Behalf of Themselves and all Others Similarly Situated, | CV-99-BU-3262-S |
| Plaintiffs, | CIVIL ACTION NUMBER: ________ |
| vs. | CLASS ACTION |
| LIBERTY NATIONAL INSURANCE COMPANY, Defendant. | Plaintiffs Demand a Trial by Jury |

**CLASS ACTION COMPLAINT**

Plaintiffs bring this action both individually and on behalf of the class of persons defined below against Liberty National Insurance Company, and pursuant to their investigation, upon knowledge as to themselves and their own acts and otherwise upon information and belief, for their Complaint allege as follows:

## I. JURISDICTIONAL ALLEGATIONS

1. Plaintiffs, Ellen Gayle Moore, Fannie McConnell, Spencer Williams and Anita Bowers are a citizens of DeKalb County, State of Alabama.

2. Defendant, Liberty National Insurance Company is an Alabama Corporation which conducts substantial business in many states. Liberty National Insurance Company and several life

insurance companies owned by Liberty National Insurance Company sold a substantial number of industrial insurance products, including, but not exclusive of life insurance, burial insurance, and health and accident insurance. Service Insurance Company of Alabama ("Service"), was a a wholly owned subsidiary of Liberty National Insurance Company, which has been merged into Liberty National Insurance Company. Liberty National Insurance Company is responsible for and has assumed the liabilities of Service. Prior to the merger referred to above, Service was operated by and controlled by Liberty National Insurance Company for the purpose of issuing insurance products to African-Americans. At all times Liberty National Insurance Company has controlled Service in all respects including but not limited to the establishment of premium rates and Policy administration and issuance policies and procedures. Liberty National Insurance Company and Service are hereinafter collectively referred to as "Liberty National" in this Complaint.

3. A substantial number of the events or omissions which gave rise to the Plaintiffs' claim took place in DeKalb County, Alabama.

4. Because the defendant resides in this district and because a substantial part of the events or omissions giving rise to the claim occurred in this district, venue is proper in this district and this division. Federal jurisdiction exists pursuant to 28 U.S.C. § 1331 as to Plaintiffs' claim of race discrimination in violation of 42 U.S.C. § 1981. The Court has supplemental jurisdiction of all remaining claims pursuant to § 1367.

## II. NATURE OF THE CASE

5. This is a class action seeking redress for a nationwide fraudulent scheme and common course of conduct involving racial discrimination, deceptive sales practices, unconscionable conduct,

overreaching, fraud and deception by Liberty National Insurance Company relating to the training of its agents and the marketing, sale and administration of so-called "industrial life" insurance policies. As used in this Complaint, the terms "Policies", "Industrial Policies", "Industrial Insurance", "Industrial Life Insurance" refer to industrial life insurance products, including, but not limited to life insurance, burial insurance and health and accident insurance marketed, sold or administered by Liberty National.

6. This action is brought by Plaintiffs as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination) an ownership interest in one or more Industrial Policies issued by Liberty National, and whose Policies were issued and administered based upon the nationwide unconscionable scheme and common course of conduct described herein and who were thereby harmed (the "Class" or "Class Members").

7. Plaintiffs seek injunctive and equitable relief, compensatory damages, punitive damages and other remedies for Liberty National's unlawful, unconscionable and racially discriminatory conduct described herein in connection with the training of its agents and the sale and administration of Industrial Life insurance Policies to Plaintiffs and Class Members.

8. For more than fifty years, Liberty National has maintained a fraudulent, unlawful and unconscionable scheme in order to increase its own revenues and profitability to the detriment of Class Members, by implementing uniformly misleading, deceptive, unconscionable, and racially discriminatory sales and Policy administration practices. Liberty National instituted these practices, inter alia, in order to compete with other insurance companies offering similar types of Policies.

9. Industrial Life Insurance is a life insurance product with relatively low face value

which is typically, although not always, less than $20,000, and premium payments which are intentionally designed to appear to the policy holder to be modest premium payments. These premium payments have been historically collected on a weekly or monthly basis by Liberty National sales agents.

10.    As part of its nationwide scheme, Liberty National targeted low income, impoverished, unsophisticated and minority segments of the population and marketed the Industrial Life Insurance product for sale to these consumers. In addition, on information and belief, for many years, Liberty National Insurance Company, routinely, knowingly and intentionally caused Service to charge African-American individuals more for these Policies than Liberty National Insurance Company charged similarly situated Caucasian individuals. On information and belief, to the extent this discriminatory practice changed, African-Americans who purchased Industrial Policies before this discriminatory practice changed, continued to pay the same premiums which had been established under Liberty National's discriminatory pricing system. Liberty National also, as part of its routine practice and procedures, prohibited its agents from selling ordinary life insurance policies to African-Americans. Liberty National was motivated by discriminatory intent and continues to discriminate against African-Americans in the manner set forth below.

11.    Liberty National Insurance Company constructed the Industrial Policies with small face value and charged weekly or monthly premiums often under $1.00. Liberty National has marketed these Policies through agents who are given exclusive territories, known as "debit routes." To effectuate the sale and administration of the Industrial Policies on a "debit" basis, Liberty National agents have been trained to personally visit the homes of Class Members residing on their

routes to collect the premiums and develop a personal relationship with the Class Members that would facilitate the sale of additional Policies. Liberty National has trained its agents to market and sell certain of these Policies as "burial" protection to manipulate the emotions of prospective policyholders by instilling in, or playing to, a sense of shame in leaving their loved ones without funds to pay for a funeral at the time of their death.

12. In designing, developing, marketing and selling these Policies, at all times Liberty National and its agents have known that they had targeted a disadvantaged segment of the population which was unsophisticated with respect to insurance and related financial dealings or affairs and ill-equipped to understand the unfamiliar and technical language of the Policies, or the complex and sophisticated methods of determining premium payments. Liberty National and its agents have also known that the premiums appear small and affordable to Class Members, and that at the time of purchase the benefits totaled more than these disadvantaged individuals could conceive of saving in their lifetime. Liberty National has known but has never disclosed to Class Members what these targeted, unsophisticated Class Members did *not* know; that with respect to certain Policies, the small premiums would far exceed the face value of the Policies during the insureds' lifetime.

13. Liberty National Insurance Company designed the Industrial Policies to create the illusion that they would provide valuable yet affordable benefits. In reality, the Policies are unconscionable products which were calculated to generate tremendous profits for Liberty National with little attendant risk to Liberty National and little or no economic benefit for the unsuspecting and vulnerable Plaintiffs and Class Members. At the same time, although the premiums appeared small and affordable, the premiums are exorbitant in relation to the minimal benefits actually

provided to Class Members. Further, Liberty National has known that, in the event of lapse for nonpayment of premium, Liberty National's practice is to conceal any cash value from its policyholders and to use any cash value to pay premiums until any and all value of the Policy is completely depleted.

14. Given the design features of the Industrial Policies, Liberty National has known that virtually no transfer of risk to Liberty National has taken place. Liberty National also has known that to the extent that any risk was transferred, it was *de minimis* and would quickly dissipate over the life of the Policies. As Liberty National expected, the Company's profits have continued to expand and the *de minimis* risk, if any, has been quickly eliminated.

15. Liberty National Insurance Company has trained, allowed or encouraged its agents to routinely sell Industrial Life Insurance products to Plaintiffs and Class Members when the Class Members' best interest would have been served, assuming a life insurance need existed, by traditional ordinary life insurance of similar face amounts.

16. Liberty National Insurance Company has trained, directed and knowingly allowed its agents to sell multiple Policies where policyholders had no need for the insurance and where multiple Industrial Policies were used to reach a cumulative total of face amount which, in the best interest of the Plaintiffs and Class Members, could have been achieved through use of ordinary policies of comparable value. Liberty National has had knowledge when multiple sales occurred through its established home office issuance procedures. Nevertheless, Liberty National has maintained this practice because of the excessive profitability of the Industrial Life Insurance products.

17. Consistent with its effort to increase profits, Liberty National has knowingly and

intentionally set out to cut the administration costs associated with Industrial Policies even when doing so worked to the detriment of its African-American policyholders. Liberty National issued Industrial Policies which had, for many years, been serviced by agents on weekly debit routes. In furtherance of its plan to increase its profits and decrease its costs at the expense of African-American policyholders, Liberty National has terminated or modified the practice of weekly premium collection by debit agents throughout the country on in-force Industrial Life Policies. Liberty National has not reduced premium payments, however, even though the costs associated with the weekly debit system were expense loaded into the premium at the time of Policy issuance. This practice of weekly premium collection by agents had been in place since the inception of certain Industrial Policies and was part of the course of dealing between the African-American policyholders and Liberty National.

18. Liberty National Insurance Company has also systematically failed to pay death benefits that were due to African-American policyholders under the Industrial Policies. Liberty National has improperly reaped millions of dollars in premiums and unpaid death benefits by virtue of its fraudulent, deceptive and overreaching policy administration practices.

19. Liberty National Insurance Company's plan, scheme and nationwide common course of conduct was designed to and did induce thousands of existing and prospective African-American policy owners to purchase Industrial Life Insurance Policies from Liberty National. Plaintiffs and Class Members have lost and/or face losing millions of dollars in premiums paid which exceed the face value of the Policies or which exceed a reasonable or appropriate total of premiums which should have been paid for their Policies.

20. The sales practices described herein have been successful for Liberty National. Liberty National has received millions of dollars of premium income on the Policies including millions of dollars of premiums which cumulatively exceed the reasonable or appropriate total of premiums which should have been paid for the Industrial Policies.

21. Insurance premiums constitute the consideration paid to an insurer for the issuance and delivery of a policy of insurance. Insurance premiums are determined by multiplication of the rate (or unit charge) to the measure of exposure or amount of insurance provided in an insurance policy.

22. Rate making is the process of establishing rates used in insurance to estimate the future costs associated with the transfer of risk. Insurance rates are established by actuaries employed by insurance companies, including Liberty National. Actuaries hold themselves out, and are held out by their employers, to be professionals charged with the duty to act in the public interest. The American Academy of Actuaries has adopted Actuarial Standards of Practice as well as a Code of Professional Conduct. The Preface to the Actuarial Standards of Practice provides that Actuaries are expected to provide counsel which is not only in the clients' interest but also in the interest of the public. Actuaries are to act in the public interest with "competence, integrity and objectivity of a high order."

23. The premiums established and charged to the Plaintiffs and the Class by Liberty National for Industrial Insurance Policies are racially discriminatory, excessive, unfair, unconscionable, unlawful and unreasonable and were designed to and have yielded a rate of return on these insurance products for Liberty National which is unreasonable.

24. The running of the statute of limitations has been suspended with respect to any claims which Plaintiffs or other members of the Class have brought as a result of the unlawful and fraudulent course of conduct alleged herein. Liberty National affirmatively and fraudulently concealed its unlawful scheme and course of conduct from Plaintiffs and the Class. Plaintiff and the Class had no knowledge of Liberty National's discriminatory scheme and unlawful conduct, nor did they have any of the facts which might have led to the discovery of Liberty National's wrongdoing until some time shortly before the filing of the complaint.

25. In the alternative, the statute of limitations should be tolled under the doctrine of equitable tolling as a result of Liberty National's fraudulent, overreaching and unconscionable conduct alleged herein.

## III. FACTUAL ALLEGATIONS

26. Plaintiffs are residents of Collinsville, DeKalb County, Alabama. Ms. Moore is a 49 year old African-American who was charged a discriminatory premium on her life insurance Policy. Ms. McConnell is a 72 year old African-American who was charged a discriminatory premium on her insurance Policies. Mr. Williams is a 51 year old African-American who was charged a discriminatory premiums on his insurance Policies. Ms. Bowers is a 43 year old African-American who was charged a discriminatory premium on her insurance Policies.

**Ellen Gayle Moore**

27. Ellen Gayle Moore, is a resident of Collinsville, DeKalb County, Alabama. Ms. Moore is a 49 year old African-American who was charged a discriminatory premium on her life insurance Policy, and was also discriminated against as a result of Liberty National's discriminatory

practices alleged above.

28.    Ms. Moore is a member of the Class defined above.

29.    On November 15, 1954, Ms. Moore became the insured on an Industrial Life Insurance Policy #929921 which was issued by Service and is attached as Exhibit "A".

30.    Ms. Moore paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her Policy than similarly situated Caucasian individuals would pay.

**Fannie McConnell**

31.    Ms. McConnell is a member of the Class defined above.

32.    On April 5, 1965, Ms. McConnell became the insured on an Industrial Insurance Policy #2341927 issued by Service which is attached as Exhibit "B". On November 24, 1969, Ms. McConnell became the insured on an Industrial Insurance Policy #14758551, which was issued by Service and is attached as Exhibit "C". On June 25, 1970, Ms McConnell became the insured on an Industrial Insurance Policy #15153077, which was issued by Liberty National and is attached as Exhibit "D". On May 13, 1974, Ms. McConnell became the insured on an Industrial Insurance Policy #21460692, which was issued by Liberty National Insurance Company and attached as Exhibit "E".

33.    Ms. McConnell paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her policy than similarly situated white individuals would pay. Ms. McConnell was also discriminated against as a result of Liberty National's discriminatory practices outlined above.

34.    The premiums on the policies were established based upon a weekly debit collection

system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**Spencer Williams**

35. Mr. Williams is a member of the Class defined above.

36. On April 5, 1965, Mr. Williams became the insured on an Industrial Insurance Policy #2341929, which was issued by Service and is attached as Exhibit "F". On November 24, 1969, Mr. Williams became the insured on an Industrial Insurance Policy #14758553, which was issued by Service and is attached as Exhibit "G". On August 18, 1975, Mr. Williams became he insured on an Industrial Insurance Policy #22289217, which was issued by Liberty National Insurance Company and is attached as Exhibit H.

37. Mr. Williams paid his premiums based upon a racially discriminatory premium rate and as a result paid more for his policy than similarly situated Caucasian individuals would pay. In addition, Mr. Williams was discriminated against as a result of Liberty National's discriminatory practices alleged above.

38. Ms. Bowers is a member of the Class defined above.

39. The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**Anita Bowers**

40. On April 5, 1965, Ms. Bowers became the insured on an Industrial Insurance Policy #2341930, which was issued by Service Insurance Company of Alabama and is attached as Exhibit I. On November 24, 1969, Ms. Bowers became the insured on an Industrial Insurance Policy #14758555, which was issued by Service and is attached as Exhibit "J". On August 11, 1975, Ms. Bowers became the insured on an Industrial Insurance Policy #22275736, which was issued by Liberty National and is attached as Exhibit "K.".

41. Ms. Bowers paid her premiums based upon a racially discriminatory premium rate and as a result paid more for her policy than similarly situated Caucasian individuals would pay. In addition, Ms. Bowers was discriminated against as a result of Liberty National's discriminatory practices alleged above.

42. The premiums on the policies were established based upon a weekly debit collection system. The costs associated with this system were loaded into the premiums at the time of issuance. Despite Liberty National's termination of the weekly debit collection system, Liberty National continued to collect the same premium amounts.

**IV. ALLEGATIONS REGARDING LIBERTY NATIONAL'S FIDUCIARY DUTY AND RELATIONSHIP OF TRUST AND CONFIDENCE WITH CLASS MEMBERS**

43. Liberty National Insurance Company has repeatedly acknowledged and affirmed its relationship of trust and confidence with its policyholders, including Plaintiffs and the Class defined herein.

44. Liberty National Insurance Company held and holds a relationship of trust and

confidence with Plaintiffs and Class Members as a result of the following:

a) Liberty National Insurance Company is an insurer which subjects Liberty National to more stringent standards of conduct than those normally arising out of contract;

b) Liberty National Insurance Company cultivated a relationship of trust and confidence in Plaintiffs and Class Members, through inter alia, Liberty National's marketing, sales literature and sales presentations and servicing of the Industrial Insurance products purchased by Plaintiffs and Class Members;

c) The Industrial Policies purchased by Plaintiffs and Class Members were contracts of adhesion that were prepared by Liberty Natio :al and were not subject to negotiation. Plaintiffs and Class Members did not possess bargaining power equal to that of Liberty National.

d) Policy owners often had prior relationships with Liberty National, and Liberty National trained and/or allowed its agents to abuse and manipulate those relationships to create trust and confidence in Plaintiffs and Class Members and used such trust and confidence to sell Liberty National Industrial Policies rather than insurance or other products which were appropriate and suitable to Plaintiffs and the Class.

45. Based on the foregoing, Liberty National owed Plaintiffs and Class Members fiduciary duties, including the duty to not discriminate, the duty of good faith and fair dealing, the duty of full and fair disclosure, and the duty of care arising out of its relationship with Plaintiffs and Class Members.

46. Liberty National Insurance Company had a duty to provide complete and truthful

information to Plaintiffs and Class Members when selling Liberty National policies, including, without limitation, providing full disclosure including disclosure of any prior misrepresentations or omissions.

47. By engaging in the conduct alleged herein, Liberty National breached its duties to Plaintiffs and Class Members by omitting and failing to disclose, while under a duty to do so, numerous material facts as set forth fully throughout this Complaint. Plaintiffs and the Class suffered economic damages as a result of the breach.

48. In addition to its duties derived from its relationship of trust and confidence, Liberty Nat onal had an independent duty to disclose information to Plaintiffs and Class Members by virtue of its special relationship with them. Liberty National had sole knowledge of, or access to, material facts including, but not limited to:

a) the basis for calculation of the premium on its Industrial Insurance Policies;

b) the basis for premium pricing for Caucasian and African-American applicants for insurance;

c) the fact that during the normal life expectancy of Plaintiffs and the Class the total of premiums paid would in instances exceed the face value or cash value of the policy;

d) the net premium paid for the Policies;

e) that other more suitable insurance or other products were available which would have better served the interests of Plaintiffs and the Class and at less or comparable cost; and

f) That premiums on Industrial Policies were expense loaded with costs allegedly associated with the debit system, and that, upon cancellation of the debit system, these expenses were not deducted from the premium.

49. Liberty National Insurance Company intentionally kept Plaintiffs and Class Members uninformed of these facts ~~and capitalized on~~ its sole possession of the material facts.

## V. CLASS ACTION ALLEGATIONS

50. This case is brought as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of this action as a class action on behalf of all African-American persons who have (or had at the time of the Policy's termination), an ownership interest in one or more Industrial Life Insurance Policies issued, serviced, administered or purchased from Liberty National, and who were harmed by the conduct alleged herein ("the Class"). This case is properly brought as a class action under Rule 23, for the reasons set forth in the following paragraphs

51. This action is appropriate as a class action pursuant to Rule 23. Since Plaintiffs seek injunctive relief and corresponding declaratory relief for the entire Class, the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Liberty National. Further, adjudications with respect to individual Class Members would, as a practical matter, be dispositive of the interests of other Class Members who are not parties to the adjudication and may impair and impede their ability to protect their interests.

52. Membership in the Class is so numerous that separate joinder of each member is

impracticable. The number of Class Members is unknown but can be easily determined from the records of Liberty National. Plaintiffs believe that there are thousands of persons in the Class. Although Plaintiffs do not presently know the names of all Class Members, their identities and addresses can be readily ascertained from Liberty National's records.

53.    The named Plaintiffs are members of the Class of victims described herein. They were subject to a fraudulent scheme and common course of conduct by Liberty National and purchased Industrial Life Insurance from Liberty National based upon the deceptive sales and policy administration practices described herein.

54.    There are numerous and substantial questions of law and fact common to all Class Members which control this litigation and which predominate over any individual issues. Included within the common questions are:

a)    Whether Liberty National discriminated against Class Members by charging them more in premiums for Industrial Life Insurance than similarly situated Caucasian people; whether Liberty National discriminated against Class Members by offering only substandard products to African-Americans; whether Liberty National discriminated against Class Members by altering the debit system of collection unilaterally;

b)    Whether Liberty National devised and deployed a scheme or artifice to defraud or engaged in a common course of business which acted to defraud or deceive Plaintiffs and Class Members and/or committed an imposition against the Plaintiffs and the Class by exacting unreasonable premiums for its Industrial Policies through taking advantage of its position of superior knowledge;

c) Whether Liberty National routinely engaged in fraudulent and deceptive acts and practices and courses of business in the sale and administration of its Industrial Policies, overreached and otherwise took unfair advantage of its position relative to the Plaintiffs and the Class;

d) Whether Liberty National routinely failed to disclose to Plaintiffs and Class Members, material information such as the actual basis on which premiums would be calculated and the likelihood that, during the policyholder's normal life expectancy premium payments would exceed the face value of the policies or a reasonable amount of total premiums;

e) Whether Liberty National developed, encouraged and engaged in a scheme designed to sell new Industrial Policies through fraudulent concealment of material facts;

f) Whether Liberty National failed to supervise and train its agents who engaged in the schemes described herein and failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;

g) Whether Liberty National breached its contracts with the Plaintiffs and the Class by refusing or deliberately failing to credit premium payments to Industrial Policies in an effort to cause such Policies to lapse;

h) Whether Liberty National failed to adequately supervise, educate and train its agents regarding the terms of its Policies, appropriate methods of sales presentations, creation of sales materials and information, and compliance with state and federal laws (including state insurance laws and regulations), and whether Liberty National's failure to do so

constituted a means by which Liberty National engaged in the schemes described herein;

I) Whether Liberty National negligently hired, retained or promoted agents to sell Industrial Policies to Plaintiffs and Class Members, when such agents engaged in the wrongful practices alleged herein;

j) Whether Liberty National engaged in a nationwide fraudulent course of conduct in targeting the sale of Industrial Life Insurance to an economically disadvantaged and unsophisticated segment of the population and marketed and sold such policies in a manner to induce the purchase of the Industrial Policies by Plaintiffs and Class Members, and whether Liberty National discriminated against Class Members in establishing premiums for Industrial Policies;

k) Whether Plaintiffs and Class Members are entitled to specific performance, injunctive relief or other equitable relief against Liberty National;

l) Whether Plaintiffs and Class Members are entitled to an award of punitive damages against Liberty National;

m) Whether Plaintiffs and Class Members have sustained damages and the proper measure of damages; and

n) Whether Liberty National terminated or altered the debit system and failed to provide a premium rebate or reduction, even though the Policies were expense loaded for weekly collection.

55. The claims of the Plaintiffs are typical of the claims of the Class, and Plaintiffs have no interest adverse to the interests of other Class.

56. Plaintiffs will fairly and adequately protect the interests of the Class and has retained counsel experienced and competent in prosecution of insurance class actions and complex litigation.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Class Members will continue to suffer damage and Liberty National's violations of law will proceed without remedy while Liberty National continues to retain the proceeds of its ill-gotten gains.

58. Most individual Class Members have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, the size and scope of Liberty National's uniform sales scheme, th significant costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual Class Members.

59. This action will result in an orderly and expeditious administration of Class claims. Economies of time, effort and expense will be fostered and uniformity of decisions will be insured.

60. This action presents no difficulty that would impede its management by the Court as a class action and a class action is superior to other available methods for the fair and efficient adjudication of their claims.

61. Plaintiffs seek preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to require Liberty National to specifically perform the Policies as represented and to disgorge any premium overcharges.

**COUNT I**
**(Race Discrimination 42 USC § 1981)**

62. Plaintiffs repeat, reallege, and incorporate herein by reference paragraphs 5 through

61 above as if fully set forth herein.

63. Defendant intentionally discriminated against Plaintiffs and Class Members by charging them higher premiums than those charged to similarly situated Caucasian policyholders and by prohibiting or specifically instructing their agents to not offer or sell participatory whole life or other reasonably priced policies or products to African-Americans.

64. By charging higher premiums to African-Americans and refusing to offer participatory whole life or other reasonably priced policies or products to African-Americans, Defendant violated the rights of Plaintiffs and Class Members to make and enforce contracts on the same terms as Caucasian policyholders.

65. Defendant's actions violate 42 U.S.C. § 1981, as well as the rights of Plaintiffs and the Class under the Fifth, Thirteenth, and Fourteenth Amendments of the Constitution of the United States.

66. Defendant has damaged Plaintiffs and Class Members because Plaintiffs and the Class have suffered economic loss and mental anguish as a result Defendant's illegal racial discrimination.

**COUNT II**
**(Breach of Fiduciary Duty)**

67. Plaintiffs repeat and reallege the allegations contained in paragraph 5 through 61 above as if fully set forth herein.

68. Liberty National Insurance Company is an insurance carrier. The life insurance business involves elements of public trust which subject Liberty National to more stringent standards of conduct than those normally arising out of contract.

69.    In connection with the sales of Industrial Insurance Policies, Liberty National agents, with the aid and/or under the direction of Liberty National officers, managers and other high-level personnel located at its headquarters and elsewhere, were trained to provide advice and counsel to Liberty National policy owners on the subject of what would be in the policy owner's best interest with respect to the acquisition of Industrial Insurance coverage.

70.    Liberty National Insurance Company, held itself and its agents out as highly skilled insurance experts, creating the image of insurance expertise, possessing the special knowledge and expertise needed to interpret and understand the mechanics of the Policies. Liberty National encouraged Plaintiffs and Class Members to rely on this special knowledge and expertise in purchasing the Policies, and counseled Plaintiffs and Class Members concerning the insurance Liberty National was selling.

71.    Liberty National Insurance Company had superior knowledge to that of Plaintiffs and Class Members concerning not only the insurance products available, but also whether Industrial Insurance coverage was appropriate and to what extent the policyholder was at risk for paying more in premiums than the face value of the Policies or than an amount which reasonably should have been paid. The relationship between Liberty National, by and through its agent, and Plaintiffs and Class Members, was calculated and intended by Liberty National to cause the Plaintiffs and Class Members to repose confidence and trust in Liberty National related to insurance.

72.    Liberty National Insurance Company, by and through its agents, knew or should have known that Plaintiffs and Class Members placed this confidence and trust in the Company and, by

and through its agents, accepted the confidence and trust reposed in the Company by Plaintiffs and Class Members.

73. Liberty National Insurance Company knew or should have known that Plaintiffs and Class Members generally had no prior training, expertise or knowledge concerning insurance coverage and were unsophisticated insurance consumers ill-equipped to understand the unfamiliar and technical language of the Policies. Plaintiffs and Class Members relied solely upon the advice, recommendations and explanations of the Policies provided by Liberty National and its agents.

74. The Policies purchased by Plaintiffs and Class Members were contracts of adhesion that were prepared by Liberty National and were not the subject of negotiation and Plaintiffs and Class Members did not possess equal bargaining power.

75. Class Members often had prior relationships with Liberty National agents, and Liberty National and those agents manipulated such relationships to create trust and confidence in Liberty National and to use such trust and confidence to sell insurance.

76. As a result of the circumstances described above, Liberty National, by and through its agents, created a fiduciary relationship between themselves and Plaintiffs and Class Members. As a result of this fiduciary relationship, Liberty National and its agents were required to do the following:

a) Refrain from discrimination against African-Americans in the sale and administration of insurance policies;

b) Make full and fair disclosure to Plaintiffs and Class Members regarding the nature of the product being sold and the financial effect of the transaction on the customer;

c) Provide any information necessary to make other representations provided not misleading;

d) Cure any prior misrepresentations;

e) Advise Plaintiffs and Class Members of the commissions that were being earned by the agents as a result of the transaction, the sales load and the administrative charges being earned by Liberty National;

f) Act in a way that was beneficial to, and not detrimental to, Plaintiffs and Class Members; and

g) Refrain from making statements or sales presentations which contained misrepresentations;

h) Refrain from changing the terms of the Policy and/or representations unilaterally.

77. Liberty National Insurance Company and its agents as fiduciaries, owed to Plaintiffs and Class Members a duty to refrain from self-dealing, a duty of loyalty, an overall duty not to take unfair advantage of Plaintiffs and a duty not to conceal from Plaintiffs and Class Members facts which were pertinent and material to the sale of insurance to them. In executing the sales scheme described above, Liberty National, by and through its agents, knowingly, recklessly, maliciously and with intent to defraud, took unfair advantage of Plaintiffs and the Class, concealed pertinent and material information from Plaintiffs and Class Members in selling coverage to them.

78. Plaintiffs and Class Members had a right to rely upon Liberty National agents to

disclose to them, and not to conceal from them, pertinent and material facts in connection with the sale of insurance to them. Plaintiffs and Class Members did rely on Liberty National and its agents which resulted in damages to them, including punitive damages in an amount to be determined at trial.

**COUNT III**
**(Assumpsit or Money Had and Received)**

79. Plaintiffs repeat and reallege the allegations contained in paragraphs 5 through 61 above, as if fully set forth herein.

80. As a result of the conduct of Libert National outlined above, Liberty National took advantage of its position relative to the Plaintiffs and the Class and exacted a greater price for its Industrial Policies than was fair and reasonable. At all times in these transactions due to the superior knowledge of Liberty National, Plaintiffs and the Class had no meaningful choice or ability to negotiate the terms of the agreement.

81. The exaction by Liberty National of the unreasonable premiums outlined above was achieved through imposition, imposture, fraud, deception, cheat, artifice, trickery, trick, coercion, extortion and/or oppression.

82. In equity and good conscience Plaintiffs and the Class ought to have the relief they seek in this action, and Liberty National ought not be permitted to retain it.

83. By reason of the foregoing, Plaintiffs and the Class have been damaged and seek return of all premium payments paid in excess of the face value of the Policies or in excess of what

reasonably should have been paid for the Policies in a specified amount to be determined at the trial in this action.

**COUNT IV**
**(Declaratory and Injunctive Relief)**

84. Plaintiffs repeat and reallege the allegations contained in paragraph 5 through 61 above, as if fully set forth herein.

85. As stated above, Liberty National and its agents are permitted by law to establish rates and collect premiums only if those rates and premiums are not excessive and unreasonable and/or racially discriminatory.

86. Plaintiffs, for themselves and on behalf of the Class, are in doubt as to their rights under the policies and seek a declaration of the rights and liabilities of the parties, including a judgment declaring that Liberty National must charge premiums for Industrial Insurance Policies which are non-discriminatory, are reasonable, and not excessive and unconscionable. Plaintiffs and the Class further seek a declaration that any Policy which requires the payment of premiums which are racially discriminatory or which exceed a rate which is actuarially proper in light of the benefits provided is unconscionable and illegal.

87. Plaintiffs, for themselves and on behalf of the Class, seeks injunctive relief enjoining Liberty National from collecting premium payments on any Policy where the premiums paid are discriminatory or exceed a rate which is actuarially proper in light of the benefits provided. Plaintiffs seek disgorgement of all premiums paid on such Policies with interest. Plaintiffs further seek a mandatory injunction requiring Liberty National to treat any Policy on which the premiums

charged exceed the face value of the Policy and/or the amount that reasonably should have been charged based upon sound and proper actuarial principles, as a paid-up Policy and to provide such other relief as is just and proper including recissionary relief.

88. Plaintiffs and Class Members have no adequate remedy at law.

89. By reason of the foregoing, Plaintiffs and Class Members are entitled to declaratory and injunctive relief as set forth above.

**COUNT V**
**(Unjust Enrichment and Imposition of a Constructive Trust)**

90. Plaintiffs repeat and reallege the allegations contained in paragraphs 5 through 61 above, as if fully set forth herein.

91. As a result of the relationships between the parties and the facts as stated above, a constructive trust should be established over the monies paid by Plaintiffs and Class Members, as policy premiums, to the extent the total of those premiums are racially discriminatory and/or exceed the face value of any Policy or the amount which reasonably should have been paid based upon sound and proper actuarial principles. To the extent premiums have been paid by African-Americans pursuant to Liberty National's discriminatory practices, and, as a result, such contracts are illegal as a matter of law. Such monies are traceable to Liberty National, which is the current possessor of such funds.

92. Liberty National Insurance Company received from Class Members premium payments which are racially discriminatory, excessive and unreasonable and are the result of overcharging and overreaching and racially discriminatory practices.

93. As a result, Plaintiffs and the Class have conferred a benefit on Liberty National and Liberty National has knowledge of this benefit and has voluntarily accepted and retained the benefit conferred on it. Liberty National will be unjustly enriched if it is allowed to retain such funds, and, therefore, a constructive trust should be imposed on all monies wrongfully obtained by Liberty National.

94. Plaintiffs and Class Members have no adequate remedy at law.

95. By reason of the foregoing, Plaintiffs and Class Members have been irreparably harmed and are entitled to imposition of a constructive trust as set forth above.

**COUNT VI**
**(Improper Hiring, Supervision, Retention, and Failure to Monitor Actions of Officers, and Agents and/or Employees)**

96. Plaintiffs repeat, reallege and incorporate herein by reference, paragraphs 5 through 61 above as though fully set forth herein.

97. At the time the acts and omissions complained of were performed, Defendant's agents, actuaries and employees were not competent, qualified or capable of protecting the interests of Defendant's customers in regard to Policies.

98. Defendant, Liberty National knew or should have known that its agents, actuaries and employees were not acting in a competent, qualified or capable manner as to their actions towards Plaintiffs and the Class.

99. Defendant has a duty to monitor and/or supervise the activities of its agents and actuaries.

100. Defendant, Liberty National, intentionally, knowingly, recklessly and/or negligently failed to monitor the actions of its agents, actuaries and employees; train its agents, actuaries and employees to refrain from racial discrimination, to properly handle the insurance interests of its customers and properly follow and/or apply its rules, regulations, policies and procedures resulting in damage to Plaintiffs and the Class including but not limited to forgery of policy lien documents by agents, racially discriminatory and unreasonable premiums, and the purchase of inappropriate and unsuitable Policies.

101. Defendant, Liberty National, knew or should have known of the unfitness of its agents and actuaries but nonetheless employed and continued to employ them.

102. Defendant authorized the wrongful acts and omissions of its agents and actuaries in issuing the Policies and/or collecting or establishing the premiums on same.

103. Defendant ratified the wrongful acts and omissions of its agents and actuaries in issuing the Policies and collecting premiums on same.

104. Defendant was aware of the unfitness of its agents and actuaries.

105. The acts and omissions of Defendant's agents and actuaries in issuing the Policy and establishing and collecting the of premiums on same were calculated to and did benefit Liberty National.

106. As a proximate result of Liberty National's acts and omissions, Plaintiffs suffered economic loss.

**COUNT VII**
**(Breach of Contract)**

107. Plaintiffs repeat, reallege and incorporate herein by reference, paragraphs 5 through 61 above.

108. As a material part of the insurance agreement between Liberty National and Plaintiffs and the Class (either through the express terms of the policies, applicable statutory provisions or the course of dealing of the parties) from inception of certain policies, premium payments were collected by debit agents for Liberty National on a weekly basis.

109. Liberty National Insurance Company has unilaterally dismantled and/or altered the established weekly debit premium collection system which had been the established method of premium collection since inception of certain policies, and thereafter required premium payments to be made directly to Liberty National by Plaintiffs and the Class or collected them on a less frequent basis. At the same time, Liberty National continued to demand and collect the same premium paid under the original debit system even though it was no longer providing the same debit collection to the policyholder. In this respect Liberty National collected premiums for coverage which was not provided, or in other words, collected unearned premiums.

110. By dismantling or altering the established debit premium collection system and thereby unilaterally altering the method of premium collection, Liberty National breached a material contractual term of its agreement with Plaintiffs. As a result of the breach, Plaintiffs and the Class have suffered economic damage. By paying premiums directly rather than through the debit procedure contemplated at the time of contracting, class members have lost a bargained-for service

with no corresponding decrease in premiums. Plaintiffs have also been forced to incur additional burdens and expenses in making such payments. In addition, Liberty National's discontinuance of the debit premium collection system resulted in the lapse of numerous policies.

**COUNT VIII**
**(Fraudulent Inducement)**

111. Plaintiffs repeat, reallege and incorporate herein by reference, paragraphs 5 through 61 above as though fully set forth herein.

112. As set forth above, Defendant made affirmative misrepresentations to Plaintiffs and concealed material facts from Plaintiffs.

113. At the time the misrepresentations were made, Defendant knew that the representations were false, or made or caused to be made such representations without knowledge of the truth or falsity of such representations.

114. Defendant made the misrepresentations in order to induce Plaintiffs to rely on the misrepresentations. Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions.

115. As a direct and proximate result of Plaintiffs' reasonable and justifiable reliance on the affirmative misrepresentations and omitted material facts, Plaintiffs have suffered mental anguish and monetary and other damages.

**COUNT IX**
**(Negligent Misrepresentation)**

116. Plaintiffs repeat, reallege and incorporate herein by reference, paragraphs 5 through 61 above as though fully set forth herein.

117. As set forth above, Defendant made affirmative misrepresentations to Plaintiffs and concealed material facts from Plaintiffs.

118. At the time the misrepresentations were made, Defendant should have known that the representations were false, or made or caused to be made such representations without knowledge of the truth or falsity of such representations.

119. Defendant made the misrepresentations in order to induce Plaintiffs to rely on the misrepresentations. Plaintiffs reasonably and justifiably relied on the misrepresentations and omissions.

120. As a direct and proximate result of Plaintiffs reasonable and justifiable reliance on the affirmative misrepresentations and omitted material facts, Plaintiffs have suffered mental anguish and monetary and other damages.

**WHEREFORE**, Plaintiffs demand judgment against Liberty National for themselves and Class Members as follows:

a) An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b) Awarding Plaintiffs and the Class compensatory and punitive damages in an amount to be proven at trial for the wrongful acts complained of;

c) Awarding Plaintiffs and the Class their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

d) Granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including attaching, impounding or imposing a constructive trust upon, or

otherwise restricting, the proceeds of Liberty National's ill-gotten funds to ensure Plaintiffs and Class Members have an effective remedy; and

e) Granting the declaratory and injunctive relief contained in paragraphs 86 and 87 of Count IV, the Declaratory Judgment count; and

f) Granting such other and further relief as the Court deems just and proper including but not limited to recissionary relief and reformation.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand trial by jury on all issues triable at law.

W. Christian Hoyer, Esquire
Christa L. Collins, Esquire
James, Hoyer, Newcomer, Forizs
& Smiljanich, P.A.
One Urban Centre
4830 W. Kennedy Blvd.
Suite 147
Tampa, Florida 33609
(813) 286-4100
(913) 286-4174

Joe Whatley, Esquire
Charlene P. Cullen, Esquire
Whatley Drake, L.L.C.
1100 Financial Center
505 20th Street North
Birmingham, Alabama 35203
Office (205) 328-9576
Fax (205) 328-9669

Herman Watson, Esquire
Rebekah Keith, Esquire
Watson Jimmerson, P.C.
200 Clinton Avenue West, Suite 800
Post Office Box 46
Huntsville, AL 35804
Office: (256) 536-7423
Fax: (256) 536-2689

Melvyn I. Weiss, Esquire
Milberg, Weiss, Bershad, Hynes
& Lerach, L.L.P.
One Pennsylvania Plaza
New York, NY 10119-0165
Office: (212) 594-5300
Fax: (212) 868-1229

John J. Stoia, Jr., Esquire
Milberg, Weiss, Bershad, Hynes &
Lerach, LLP
600 W. Broadway
1800 One America Plaza
San Diego, CA 92101
Office (619) 231-1058
Fax (619) 231-7423

Andrew S. Friedman, Esquire
Bonnett, Fairbourn, Friedman &
Balint
4041 N. Central Avenue, Suite 1100
Phoenix, AZ 85012
Office: (602) 274-1100
Fax: (602) 274-1199

Ron Parry, Esquire
Arnzen, Parry & Wentz, P.S.C.
128 East Second Street
P.O. Box 472
Covington, KY 41012-0472
Office (606) 431-6100
Fax (606) 431-2211

N:\LIBNATBU\PLEADING\COMPLAIN.WPD

A

10 PAYMENT LIFE INSURANCE

Service Insurance Company of Alabama

BIRMINGHAM, ALA.

PREMIUMS PAYABLE FOR 10 YEARS

(AMOUNT OF INSURANCE GRADED FOR AGES UNDER 5)

READ YOUR POLICY

CX-4-51

## SCHEDULE

CX-8-51

| NAME OF INSURED | BENEFICIARY | TYPE POLICY |
|---|---|---|
| MOORE ELLEN G | MOORE PAULINE | CX CX |

| POLICY NUMBER | DATE OF ISSUE MO. | DAY | YR. | AGE* | (CENTS) WEEKLY PREMIUM | AMOUNT OF INSURANCE | DIST. | DEBIT |
|---|---|---|---|---|---|---|---|---|
| CX 929921 | 11 | 15 | 54 | 5 | 55 | $ 500 | 4 | 115 |

*INSURED'S AGE NEXT BIRTHDAY

## REGISTER OF CHANGE OF BENEFICIARY

NOTE—NO CHANGE, DESIGNATION OR DECLARATION, SHALL TAKE EFFECT UNTIL ENDORSED ON THIS POLICY BY THE COMPANY AT ITS HOME OFFICE.

| DATE ENDORSED | BENEFICIARY | ENDORSED BY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

Burial Service Company of Alabama having discharged each and every obligation and liability set forth and stipulated herein, the undersigned beneficiary under this policy hereby surrenders the said policy and certifies that there is held against the said company no further claims hereunder.

____________________ WITNESS

____________________ BENEFICIARY

Dated at ____________________ this ______ day of ______________, 19____

# Service INSURANCE COMPANY of Alabama

BIRMINGHAM, ALA.

Will pay to the beneficiary in accordance with the provisions of this Policy the amount of insurance granted hereunder upon receipt of due proof of the death of the Insured whose name appears in the schedule on the fourth page hereof.

CONSIDERATION—The insurance is granted hereunder in consideration of the payment in advance of the weekly premium stated in the schedule on Page 4 hereof on or before each Monday beginning with the date of issue of this Policy and continuing until premiums shall have been paid for 10 years or until prior death of the Insured.

AMOUNT OF INSURANCE—The amount of of insurance hereunder is the amount set out in the schedule herein, unless at date of death the Insured is under three years of age, in which event, the amount payable for each $100 set out in the said schedule shall be as follows:

(a) Under three months of age at death, twelve dollars;
(b) Three months or over but under one year of age at death, eighteen dollars;
(c) One year or over but under two years of age at death, twenty-four dollars;
(d) Two years or over but under three years of age at death, sixty-five dollars;
(e) Three years of age or over at death, full benefit.

(1) PAYMENT OF PREMIUM—All premiums are payable at the Home Office of the Company weekly in advance, but may be paid to an authorized representative of the Company, provided that such payment must be entered at the time in the premium receipt book belonging with this Policy. The failure of the collector to call for the premium on the Policy will not be an excuse for non-payment as the Insured will then be required to pay the premium at a Branch Office of the Company or remit the same to the Home Office.

(2) PREMIUMS PAYABLE OTHER THAN WEEKLY—The premium stated in the schedule of this Policy is a weekly premium. However, if premiums are paid Annually (52 weeks) in advance at one time, such Annual Premium shall be calculated by multiplying the stated weekly premium by 46.8. If premiums are paid Semi-Annually (26 weeks) in advance at one time, the Semi-Annual Premiums shall be calculated by multiplying the weekly premium stated by 24.7.

(3) GRACE PERIOD—A grace period of four weeks shall be granted for the payment of every premium after the first, during which time this Policy will remain in force subject to the terms hereof, but after the expiration of the said period of grace the Company's liability under this Policy shall cease except as to the Non-Forfeiture privileges herein contained.

(4) REINSTATEMENT—In the event this Policy should lapse it may be reinstated at any time within three years after due date of the first premium in such default, upon the furnishing to the Company of evidence of insurability satisfactory to the Company and the payment of all premiums in default unless the Extended Insurance has expired or the Cash Surrender Value has been paid.

(5) EFFECTIVE DATE—This Policy shall take effect on its date of issue, provided the Insured is then alive and in sound health, but not otherwise.

CONDITIONS AND PROVISIONS—This Policy is issued and accepted subject to all of the terms, conditions, provisions, schedules, registers and endorsements printed or written by the Company on this or the succeeding pages hereof, which are a part of this Policy as fully as if recited over the signatures hereto affixed.

In Witness Whereof, The Company has caused this Policy to be executed by its President and Secretary at its Home Office in Birmingham, Alabama, as of the date of issue appearing herein.

A C Brown — SECRETARY

W. B. Sowell — PRESIDENT

10 PAYMENT LIFE INSURANCE—PREMIUMS PAYABLE 10 YEARS

OX-4-4

# TABLE OF NON-FORFEITURE BENEFITS

FOR A POLICY FOR WHICH THE AMOUNT OF INSURANCE IS $100

| Age at Issue | 2 YRS. Ext. Ins. Mos. A | 3 YEARS Ext. Ins. Mos. A | 3 YEARS Paid Up Ins. B | 4 YEARS Ext. Ins. Mos. A | 4 YEARS Paid Up Ins. B | 5 YEARS Ext. Ins. Mos. A | 5 YEARS Paid Up Ins. B | 5 YEARS Cash Value C | 6 YEARS Ext. Ins. Mos. A | 6 YEARS Paid Up Ins. B | 6 YEARS Cash Value C | 7 YEARS Ext. Ins. Mos. A | 7 YEARS Paid Up Ins. B | 7 YEARS Cash Value C | 8 YEARS Ext. Ins. Mos. A | 8 YEARS Paid Up Ins. B | 8 YEARS Cash Value C | 9 YEARS Ext. Ins. Mos. A | 9 YEARS Paid Up Ins. B | 9 YEARS Cash Value C | 10 YEARS Ext. Ins. Mos. A | 10 YEARS Paid Up Ins. B | 10 YEARS Cash Value C | Age at Issue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 22 | 120 | $18 | 188 | $30 | 248 | $42 | $11 | 307 | $64 | $14 | 378 | $64 | $17 | 448 | $77 | $21 | 523 | $88 | $25 | Pd. Up | $100 | $28 | 1 |
| 2 | 35 | 129 | 18 | 187 | 31 | 243 | 43 | 11 | 300 | 54 | 16 | 373 | 66 | 18 | 443 | 78 | 22 | 518 | 83 | 25 | Pd. Up | 100 | 29 | 2 |
| 3 | 37 | 127 | 18 | 182 | 31 | 238 | 43 | 11 | 306 | 64 | 16 | 360 | 66 | 18 | 436 | 78 | 22 | 507 | 88 | 26 | Pd. Up | 100 | 30 | 3 |
| 4 | 48 | 128 | 20 | 181 | 32 | 236 | 43 | 12 | 288 | 66 | 15 | 368 | 67 | 19 | 428 | 78 | 23 | 489 | 88 | 27 | Pd. Up | 100 | 31 | 4 |
| 5 | 88 | 127 | 20 | 178 | 32 | 232 | 44 | 12 | 283 | 66 | 18 | 356 | 67 | 20 | 422 | 78 | 23 | 481 | 88 | 27 | Pd. Up | 100 | 31 | 5 |
| 6 | 68 | 128 | 21 | 177 | 33 | 231 | 45 | 13 | 292 | 66 | 17 | 354 | 68 | 20 | 417 | 78 | 24 | 484 | 90 | 28 | Pd. Up | 100 | 32 | 6 |
| 7 | 68 | 125 | 22 | 173 | 34 | 227 | 45 | 13 | 287 | 57 | 17 | 348 | 68 | 21 | 410 | 79 | 25 | 478 | 90 | 28 | Pd. Up | 100 | 33 | 7 |
| 8 | 68 | 120 | 22 | 164 | 34 | 222 | 46 | 14 | 281 | 57 | 18 | 342 | 64 | 21 | 402 | 79 | 25 | 469 | 90 | 29 | Pd. Up | 100 | 33 | 8 |
| 9 | 68 | 115 | 22 | 163 | 34 | 218 | 46 | 14 | 278 | 67 | 18 | 334 | 68 | 22 | 394 | 79 | 26 | 460 | 90 | 30 | Pd. Up | 100 | 34 | 9 |
| 10 | 62 | 118 | 23 | 157 | 34 | 212 | 46 | 14 | 271 | 67 | 18 | 328 | 68 | 22 | 388 | 78 | 26 | 464 | 90 | 31 | Pd. Up | 100 | 36 | 10 |
| 11 | 56 | 104 | 23 | 152 | 34 | 207 | 45 | 16 | 266 | 67 | 18 | 323 | 68 | 23 | 382 | 78 | 27 | 447 | 88 | 31 | Pd. Up | 100 | 35 | 11 |
| 12 | 54 | 88 | 23 | 147 | 34 | 202 | 45 | 16 | 260 | 58 | 19 | 317 | 67 | 23 | 376 | 78 | 27 | 440 | 89 | 32 | Pd. Up | 100 | 36 | 12 |
| 13 | 50 | 84 | 22 | 143 | 34 | 196 | 46 | 16 | 254 | 68 | 19 | 312 | 67 | 23 | 368 | 78 | 28 | 433 | 89 | 32 | Pd. Up | 100 | 36 | 13 |
| 14 | 46 | 81 | 22 | 140 | 34 | 194 | 44 | 15 | 251 | 68 | 19 | 306 | 67 | 24 | 361 | 78 | 28 | 428 | 88 | 32 | Pd. Up | 100 | 37 | 14 |
| 15 | 43 | 68 | 22 | 137 | 33 | 191 | 44 | 16 | 248 | 66 | 20 | 301 | 67 | 24 | 357 | 78 | 29 | 418 | 88 | 33 | Pd. Up | 100 | 37 | 15 |
| 16 | 41 | 86 | 22 | 134 | 33 | 188 | 44 | 16 | 242 | 66 | 20 | 294 | 66 | 24 | 350 | 78 | 29 | 412 | 88 | 34 | Pd. Up | 100 | 38 | 16 |
| 17 | 39 | 84 | 22 | 133 | 33 | 188 | 44 | 16 | 238 | 65 | 20 | 291 | 66 | 25 | 344 | 78 | 29 | 406 | 88 | 34 | Pd. Up | 100 | 38 | 17 |
| 18 | 38 | 83 | 22 | 132 | 33 | 184 | 44 | 16 | 236 | 66 | 21 | 284 | 66 | 25 | 336 | 78 | 30 | 398 | 88 | 35 | Pd. Up | 100 | 40 | 18 |
| 19 | 38 | 82 | 22 | 131 | 33 | 182 | 44 | 18 | 232 | 55 | 21 | 281 | 56 | 26 | 331 | 78 | 31 | 391 | 88 | 36 | Pd. Up | 100 | 41 | 19 |
| 20 | 37 | 82 | 22 | 130 | 33 | 100 | 44 | 17 | 228 | 66 | 21 | 274 | 66 | 26 | 327 | 78 | 31 | 384 | 88 | 36 | Pd. Up | 100 | 42 | 20 |
| 21 | 38 | 82 | 22 | 130 | 33 | 178 | 44 | 17 | 225 | 66 | 22 | 271 | 66 | 27 | 321 | 78 | 32 | 377 | 88 | 37 | Pd. Up | 100 | 42 | 21 |
| 22 | 39 | 82 | 22 | 129 | 33 | 176 | 44 | 17 | 221 | 66 | 22 | 268 | 66 | 27 | 316 | 78 | 32 | 370 | 88 | 38 | Pd. Up | 100 | 43 | 22 |
| 23 | 39 | 82 | 22 | 128 | 33 | 173 | 44 | 18 | 217 | 55 | 23 | 262 | 66 | 28 | 308 | 78 | 33 | 362 | 88 | 38 | Pd. Up | 100 | 44 | 23 |
| 24 | 38 | 82 | 22 | 127 | 33 | 171 | 44 | 18 | 213 | 56 | 23 | 256 | 67 | 28 | 303 | 78 | 34 | 356 | 88 | 39 | Pd. Up | 100 | 45 | 24 |
| 25 | 38 | 82 | 22 | 126 | 33 | 168 | 44 | 19 | 209 | 66 | 24 | 251 | 67 | 29 | 294 | 78 | 34 | 348 | 88 | 40 | Pd. Up | 100 | 46 | 25 |
| 26 | 40 | 82 | 22 | 124 | 33 | 165 | 44 | 19 | 204 | 58 | 24 | 246 | 67 | 29 | 290 | 78 | 35 | 341 | 88 | 41 | Pd. Up | 100 | 47 | 26 |
| 27 | 40 | 82 | 22 | 122 | 33 | 162 | 44 | 19 | 201 | 58 | 24 | 240 | 57 | 30 | 284 | 78 | 35 | 333 | 88 | 41 | Pd. Up | 100 | 48 | 27 |
| 28 | 40 | 81 | 23 | 120 | 34 | 168 | 45 | 20 | 196 | 58 | 24 | 236 | 67 | 31 | 277 | 78 | 36 | 326 | 88 | 42 | Pd. Up | 100 | 48 | 28 |
| 29 | 40 | 80 | 23 | 118 | 34 | 164 | 45 | 20 | 192 | 58 | 25 | 228 | 67 | 31 | 271 | 78 | 37 | 318 | 88 | 43 | Pd. Up | 100 | 49 | 29 |
| 30 | 40 | 79 | 23 | 116 | 34 | 161 | 45 | 21 | 187 | 58 | 26 | 224 | 67 | 32 | 264 | 78 | 38 | 311 | 88 | 44 | Pd. Up | 100 | 50 | 30 |
| 31 | 40 | 77 | 23 | 113 | 34 | 148 | 46 | 21 | 182 | 58 | 27 | 218 | 67 | 32 | 258 | 78 | 38 | 304 | 88 | 45 | Pd. Up | 100 | 51 | 31 |
| 32 | 40 | 76 | 23 | 110 | 34 | 144 | 46 | 21 | 177 | 54 | 27 | 213 | 67 | 33 | 252 | 78 | 39 | 294 | 88 | 46 | Pd. Up | 100 | 52 | 32 |
| 33 | 38 | 74 | 23 | 107 | 34 | 140 | 46 | 22 | 173 | 54 | 28 | 207 | 67 | 34 | 246 | 78 | 40 | 288 | 88 | 46 | Pd. Up | 100 | 53 | 33 |
| 34 | 38 | 72 | 23 | 104 | 34 | 136 | 46 | 22 | 168 | 58 | 28 | 202 | 67 | 34 | 238 | 78 | 40 | 282 | 88 | 47 | Pd. Up | 100 | 54 | 34 |
| 35 | 38 | 70 | 23 | 101 | 34 | 132 | 46 | 23 | 163 | 56 | 28 | 196 | 67 | 35 | 232 | 78 | 41 | 274 | 88 | 48 | Pd. Up | 100 | 55 | 35 |
| 36 | 37 | 68 | 23 | 98 | 34 | 128 | 46 | 23 | 158 | 56 | 29 | 191 | 67 | 35 | 226 | 78 | 42 | 267 | 88 | 49 | Pd. Up | 100 | 56 | 36 |
| 37 | 36 | 66 | 23 | 65 | 34 | 124 | 46 | 23 | 154 | 56 | 29 | 186 | 66 | 36 | 218 | 78 | 43 | 260 | 88 | 50 | Pd. Up | 100 | 57 | 37 |
| 38 | 35 | 64 | 23 | 92 | 34 | 120 | 46 | 24 | 148 | 56 | 30 | 178 | 66 | 36 | 212 | 78 | 43 | 253 | 88 | 50 | Pd. Up | 100 | 58 | 38 |
| 39 | 34 | 62 | 23 | 89 | 34 | 118 | 44 | 24 | 144 | 56 | 30 | 174 | 66 | 37 | 206 | 77 | 44 | 246 | 88 | 51 | Pd. Up | 100 | 58 | 39 |
| 40 | 32 | 60 | 23 | 86 | 34 | 112 | 44 | 24 | 140 | 56 | 31 | 168 | 66 | 38 | 200 | 77 | 45 | 238 | 88 | 52 | Pd. Up | 100 | 60 | 40 |
| 41 | 31 | 57 | 23 | 83 | 34 | 108 | 44 | 25 | 136 | 56 | 31 | 163 | 66 | 38 | 193 | 77 | 46 | 232 | 88 | 53 | Pd. Up | 100 | 61 | 41 |
| 42 | 30 | 56 | 23 | 80 | 33 | 105 | 44 | 25 | 131 | 56 | 32 | 157 | 66 | 39 | 187 | 77 | 46 | 226 | 88 | 54 | Pd. Up | 100 | 62 | 42 |
| 43 | 28 | 53 | 23 | 77 | 33 | 101 | 44 | 25 | 126 | 55 | 32 | 152 | 66 | 39 | 181 | 77 | 47 | 218 | 88 | 54 | Pd. Up | 100 | 63 | 43 |
| 44 | 28 | 51 | 23 | 74 | 33 | 98 | 44 | 26 | 122 | 55 | 33 | 147 | 66 | 40 | 176 | 77 | 47 | 211 | 88 | 55 | Pd. Up | 100 | 64 | 44 |
| 45 | 27 | 50 | 23 | 72 | 33 | 94 | 44 | 26 | 117 | 56 | 33 | 142 | 66 | 40 | 168 | 77 | 48 | 204 | 88 | 58 | Pd. Up | 100 | 65 | 45 |
| 46 | 27 | 48 | 23 | 69 | 33 | 91 | 44 | 27 | 113 | 54 | 33 | 136 | 66 | 41 | 163 | 77 | 49 | 196 | 88 | 57 | Pd. Up | 100 | 66 | 46 |
| 47 | 26 | 46 | 23 | 67 | 33 | 88 | 43 | 27 | 108 | 54 | 34 | 131 | 66 | 41 | 157 | 77 | 49 | 191 | 88 | 58 | Pd. Up | 100 | 67 | 47 |
| 48 | 24 | 44 | 23 | 64 | 33 | 84 | 43 | 27 | 104 | 54 | 34 | 126 | 66 | 42 | 151 | 76 | 50 | 184 | 88 | 58 | Pd. Up | 100 | 67 | 48 |
| 49 | 24 | 43 | 23 | 62 | 33 | 81 | 43 | 27 | 100 | 54 | 35 | 121 | 66 | 42 | 146 | 76 | 51 | 178 | 88 | 59 | Pd. Up | 100 | 68 | 49 |
| 50 | 23 | 41 | 22 | 58 | 33 | 78 | 43 | 28 | 96 | 54 | 35 | 116 | 66 | 43 | 140 | 76 | 51 | 172 | 88 | 60 | Pd. Up | 100 | 69 | 50 |
| 51 | 22 | 38 | 22 | 57 | 33 | 74 | 43 | 28 | 92 | 54 | 36 | 111 | 66 | 43 | 134 | 76 | 52 | 166 | 88 | 61 | Pd. Up | 100 | 70 | 51 |
| 52 | 21 | 38 | 22 | 54 | 32 | 71 | 43 | 28 | 88 | 53 | 36 | 106 | 64 | 44 | 129 | 76 | 52 | 160 | 86 | 61 | Pd. Up | 100 | 71 | 52 |
| 53 | 20 | 36 | 22 | 52 | 32 | 68 | 42 | 28 | 84 | 53 | 36 | 102 | 64 | 44 | 124 | 76 | 53 | 154 | 86 | 62 | Pd. Up | 100 | 72 | 53 |
| 54 | 19 | 33 | 22 | 49 | 32 | 64 | 42 | 29 | 80 | 53 | 37 | 97 | 64 | 45 | 118 | 75 | 53 | 148 | 86 | 63 | Pd. Up | 100 | 73 | 54 |
| 55 | 19 | 33 | 22 | 47 | 32 | 61 | 42 | 29 | 76 | 53 | 37 | 93 | 64 | 46 | 113 | 75 | 54 | 143 | 87 | 64 | Pd. Up | 100 | 74 | 55 |
| 56 | 18 | 31 | 22 | 44 | 32 | 58 | 42 | 29 | 72 | 52 | 37 | 88 | 63 | 46 | 108 | 75 | 54 | 137 | 87 | 64 | Pd. Up | 100 | 75 | 56 |
| 57 | 17 | 30 | 22 | 42 | 32 | 56 | 42 | 30 | 68 | 52 | 37 | 84 | 63 | 46 | 104 | 75 | 55 | 132 | 87 | 65 | Pd. Up | 100 | 76 | 57 |
| 58 | 16 | 28 | 22 | 40 | 31 | 52 | 41 | 30 | 65 | 52 | 38 | 80 | 63 | 46 | 99 | 74 | 55 | 127 | 87 | 65 | Pd. Up | 100 | 76 | 58 |
| 59 | 15 | 26 | 21 | 37 | 31 | 46 | 41 | 30 | 62 | 51 | 38 | 76 | 62 | 48 | 95 | 74 | 56 | 120 | 87 | 66 | Pd. Up | 100 | 77 | 59 |
| 60 | 14 | 25 | 21 | 36 | 31 | 44 | 40 | 30 | 58 | 51 | 38 | 72 | 62 | 47 | 90 | 74 | 56 | 117 | 86 | 66 | Pd. Up | 100 | 78 | 60 |

*To obtain the amount of Paid-Up Insurance or the Cash Surrender Values for a policy of which the ultimate amount of Insurance is greater or less than $100, the v[illegible] stated should be increased or decreased proportionately; e.g., if the ultimate amount of Insurance is $200 the value should be doubled. The periods of Extended Insuranc[illegible] the same whatever the amount of Insurance.

†Premiums must have been paid on this Policy for the number of years indicated in the first line of the foregoing table to obtain the benefits indicated.

(6) MISSTATEMENT OF AGE—In the event the age at Issue is incorrectly stated herein, the Amount of Insurance hereof shall be such as the premiums paid would have purchased at the correct age, and all other benefits shall be based on such correct age and such amount of insurance.

(7) INCONTESTABILITY—After this Policy has been continued in force during the lifetime of the Insured for a period of one year from its date of issue it shall thereafter be incontestable except for non-payment of premiums.

(8) BENEFICIARY—By written notice to the Company the Insured may from time to time name a new beneficiary, subject to evidence of insurable interest satisfactory to the Company, but no such change shall be effective until endorsed on this Policy by the Company.

If the beneficiary dies before the Insured the Estate of the Insured shall then automatically become the beneficiary thereof. If the Insured's estate is the Beneficiary, the Company will make payment to the Insured's executor or administrator, provided, however, that the Company may make payments to any relative by blood or marriage, or to any person appearing to the Company to be equitably entitled to such payment because of having incurred expense for the maintenance, medical attention or burial of the Insured. If the beneficiary is a minor, or is otherwise not legally qualified to give a valid release at the time of payment hereof the Company may make payment to any person who furnishes evidence satisfactory to the Company that such person is responsible for, or is actually contributing to the support of the beneficiary.

(9) POLICY CONTROL—If the Insured hereunder is a minor, during the minority of such Insured, the right to change the beneficiary and exercise all the rights of ownership under this Policy shall be vested in the beneficiary named herein from time to time; or if such beneficiary dies before the Insured, then such rights shall be vested in the surviving parent of the Insured, or in the legal guardian of the Insured, or in any adult having the custody and control of said minor. After the Insured becomes of age, the entire ownership and control of this Policy shall be vested in the Insured.

(10) ASSIGNMENT—Neither this Policy, nor any benefit hereunder can be assigned.

(11) LOSS OF EYESIGHT OR LIMBS—After the third anniversary of the Insured's birth and during the lifetime of the Insured, if the Company shall receive due proof that during the continuance of this Policy, otherwise than as Extended Insurance or reduced Paid-Up Insurance provided in the Non-Forfeiture Benefits, the Insured has suffered any of the losses set forth below solely as a result of disease contracted or injuries sustained after the date hereof and that thirty days have elapsed since such loss, total and permanent disability shall then be deemed to exist, and upon surrender of this Policy and its premium receipt book, the Company will make immediate payment as set forth below, provided, however, that such loss was not sustained from service in the Military or Naval forces of any country at war.

A sum equal to the amount insured hereunder shall be payable in the event of
( i) loss by severance of both hands at or above the wrists;
( ii) loss by severance of both feet at or above the ankles;
(iii) loss by severance of one hand at or above the wrist and one foot at or above the ankle;
(iv) complete and irrecoverable loss of sight of both eyes prior to the seventieth anniversary of the Insured's birth.

In addition to the payments set out herein for such loss the Company will endorse this Policy with a waiver of all further premiums, paying at death the amount insured hereunder.

(12) OPTION TO SURRENDER WITHIN TWO WEEKS—If the terms of this Policy are not accepted and agreed to it may be surrendered for cancellation at the District Office of the Company through which it was delivered within two weeks from the date hereof and all premiums paid will be refunded.

(13) PRIVILEGE OF EXCHANGE—Upon written application and evidence of insurability satisfactory to the Company this Policy may be surrendered to the Company in exchange for another policy on any plan then issued by the Company requiring premium payments less frequent than weekly, provided, the new policy is for at least the minimum amount issued by the Company on the plan applied for. In executing such change the full reserve on this Policy shall be applied to reduce premium payments on the new policy in accordance with the terms and conditions then agreed upon with the Company.

(14) NON-FORFEITURE BENEFITS—Extended Insurance—In the event this Policy lapses after premiums have been paid for the respective periods shown in the Table of Non-Forfeiture Values herein the Amount of Insurance granted under this Policy shall be automatically continued in force as Extended Insurance for the number of months specified in the column marked "A" in the said Non-Forfeiture Table. The term of Extended Insurance shall commence on the due date of the first premium in default.

(A) PAID-UP LIFE INSURANCE—After this Policy has been in force with premiums paid for the number of years shown in the table below, the Insured may, by making written application upon blanks furnished by the Company within thirteen weeks of the due date of the first premium in default, have this Policy endorsed for a reduced amount of Paid-Up Life Insurance payable at the death of the Insured. Such amount shall be in accordance with the amount stated in Column "B" in the table of Non-Forfeiture Values, provided, however, that such amount of Paid-Up Life Insurance shall be in lieu of Extended Insurance.

(B) CASH SURRENDER VALUE—After this Policy has been in force with premiums paid for five full years upon written request to the Company and the surrender of this Policy and all premium receipt books or other evidence of premium payments the Company will pay the Cash Surrender Value set out in Column "C" in the Table of Non-Forfeiture Values less any indebtedness due the Company hereon. Such written request must be made within thirteen weeks of the due date of the first premium in default.

The basis of reserves for this Policy is the 1941 Standard Industrial Mortality Table (Illinois Standard) with interest at 3¼% per year.

For the years subsequent to the 20th the values are to be the equivalent of the full reserves according to the foregoing standard. Proportionate increase will be made in the non-forfeiture values shown in the table for each additional completed quarter year of premium payments.

(15) ALTERATION AND WAIVERS—This Policy contains the entire agreement between the Company and the Insured. Its terms cannot be changed or its conditions varied, except by a written agreement, signed by the President or Secretary of the Company. No other person shall have the power to make or alter contracts, waive forfeiture, or receive premiums on policies in arrears more than four weeks, or to receipt for the same, and all such arrears given to an agent or employee shall be at the risk of those who pay them and shall not be credited upon the Policy, whether receipted or not, except as set forth in the "Reinstatement" provision herein.

The maximum amount of cash insurance to any policyholder of this Company is limited to Five Hundred Dollars ($500.00) for natural death. The total liability of this Company for all policies of cash insurance in force by it on the life of the person insured by this Policy for natural death shall be the lesser of Five Hundred Dollars ($500.00) or the ... of benefits payable under all such policies.